Next case on our calendar for today is United States v. Jakes-Johnson, No. 20-2310. You're on mute, Ms. Hirsch. You're on mute. Can't hear you. I apologize. Good morning, Your Honors. My name is Andrea Hirsch, and I represent Ben Jakes-Johnson. Ben Jakes-Johnson is a 41-year-old man who was sexually abused by a much older cousin from when he was seven until he was ten. In facing the charges against him in this case, he was due a process that comported with his constitutional protections, including his right to a speedy trial. Instead, he spent three years in jail waiting for what this proceedings, a wait that ended in a trial that lasted four and a half days. Faced with significant delay, the Supreme Court asks, which side is more to blame for the delay, the government or the defense? In this case, the answer to that question is clear. Seventeen The Supreme Court also said, has he asserted the right? Has he invoked the right as another factor? And you can correct me if I'm wrong, but from the time of his arrest in March of 2017, the first time there was any discussion at all of an issue of delay where your client was saying, I want a trial, I want a speedy trial, was over two years in May of 2019, when in his opposition to the government's effort to preclude his expert insanity of defense, there was a reference in there to delay. Or am I missing something? So over two years went by before the defense counsel even mentioned that there was an issue of delay. Your Honor, there are several things I'd like to point out in response to that. First of all, defendants have no obligation to ask for their speedy trial rights to be honored when they're in good faith seeking a plea. This court has said that repeatedly in Roberts, in Greeney, in Buffalo. So first of all, the entire 17 month period when he was seeking to cooperate are off the table in terms of suggesting that he should have been asserting his right to a speedy trial. I don't agree with that. I think you're mixing two different things. That's an issue of fault. He's not faulted for that. But in terms of the separate issue was, was he telling the judge he wanted a speedy trial or not? You can do two things at the same time. You could say, I want a speedy trial. There could be some period of plea negotiation that won't be then counted to him. But you do have to assert the right. And also it affects our standard of review. If the right is never asserted, then it's point error, right? In your honor, respectfully, that is not what the cases say. Rob, they talk about defendants being lulled in to not asserting their speedy trial rights when they are seeking to cooperate, that it would be counterproductive for them to demand a speedy trial right when they're awaiting. Let's put that aside when the when the time when the government said we're not going to cooperate, and he still didn't say at that point, okay, now that we're done with that, I want a trial that there was more time that went by between the indictment, which was August of 2018. Until May of 2019. So even during that period where the plea negotiations were over, there was no mention of like, I want this trial to happen immediately, right? Your Honor, he did actually make a bail motion immediately at post indictment. And other courts have held that bail motions are an affirmation of the right to a speedy trial. But apart from that, the Supreme Court has also recognized defendants have a defendants need to prepare their own cases. So until he had prepared, he couldn't say, try me, he had to take the acts the steps that were necessary in order to prepare. As soon as he did that when he turned over, I, I would I would agree that he could have perhaps sought the court's involvement after giving his notice of intent to present an insanity defense when the when the prosecution didn't take action. He could have a little bit sooner sought the courts involved may have also hired Dr. Goldsmith while the attempts were being made to cooperate if the government obviously, as you point out, I'm going to ask them about that didn't dual track their motion to preclude and their hiring of an expert. But defense could have if you really wanted a speedy trial, you could say okay, we're doing evaluation. So if the negotiations break down, we could file a notice of insanity defense immediately. You know, the daily indictment. Your Honor, first of all, Dr. Dr. Goldsmith, the defense was pouring all of its resources into seeking this cooperation agreement. And the government was inducing it to believe that there would be a cooperation agreement. Even at month 16. We see the government saying we expect this case want us to assume bad faith from the government, because they proffered your client and didn't ultimately sign him up. But as you know, that happens a lot. There's a lot of times the government meets with someone and just ultimately decides we can't arrest anybody based upon that information. And because this wasn't litigated below on a speeding trial grounds. You want us to assume on appeal that that was bad faith on the government. They were just so intentionally delaying. And I don't know what we base that on. Well, Your Honor, you base it on the fact that after they proffered Jake's Johnson four times, they did nothing for eight months, and they would have done nothing longer. If the magistrate judge hasn't finally interceded and said what's going on here, this case is figured out they can arrest anybody based upon his information. That could take that could take some time. They don't want to sign him up. And they're not arresting anybody. Right? We don't know. I understand what you're saying. But the fact of the matter, we don't know there's nothing. There's no reason why the government ultimately wasn't able to sign him up. Could you take a minute and highlight what prejudice Mr. Jake's Johnson suffered as a result of the speeding trial failure in your view. And then I'd like you to before your time expires, I'd like you to turn to the expert testimony on the insanity defense, please. Yes, Your Honor. Jake's Johnson suffered two forms of actual prejudice the government elicited from its own expert that the longer the interval between the events at issue and the exam, the more speculative and less reliable the exam and so they use the delay against Jake's Johnson. And then secondly, they also on cross examination, they brought out that Dr. Dr. Goldsmith had not been retained in until 21 months had passed, and that no one else had examined Jake's Johnson in that interval. And therefore, nothing precluding them from having him examined earlier, though, was there? The defense having him examined? Your Honor, I've seen, I understand that's an argument the government has made. But I've seen no case that suggests that the defense had to start preparing its case and couldn't rely on the government's good faith during plea negotiations. Can I interrupt? I mean, the good faith, even assuming they they're, they acted in bad faith. I mean, doesn't defense counsel have an obligation to prepare a defense? And it and it did as soon as as soon as Jake's Johnson was examined. Dr. Goldsmith examined Jake's Johnson within one month. No, no, the point is, I mean, it's not it's not clear to me at least why cooperation has to be concluded before the exploration of his mental condition was something that would be examined. So why is it the case that cooperation had to be concluded that that process had to be concluded before an insanity defense could be pursued? Well, I believe that the, you know, that the defense had a good faith belief that the promises and the suggestions that the government were making were real, and that this would conclude it. How would he plead guilty? I mean, if he's going to cooperate, how would he plead guilty to an offense? If he was not guilty by reason of insanity, it seemed to me that it seems to me that you are almost really suggesting ineffective assistance of counsel for not pursuing the insanity defense earlier, and for not raising Speedy Trial Act objections during the course of this litigation. And that might be true, but that is not before us at this point. And we haven't had any opportunity to explore what the reasons for any of this were, right? Your Honor, he, many defendants who are innocent, plead guilty to protect themselves from mandatory maximums. So just because he was, he had an insanity defense did not mean that he would not have accepted a plea that would have protected him from the 32 life guidelines. It would have been reasonable for an attorney, it would have been, you know, for the first prong of Strickland, it would have been reasonable for an attorney to allow the client to plead guilty, notwithstanding the fact that he was not guilty by reason of insanity. Your Honor, I, yes, I believe that there was just a book written on why innocent defendants plead guilty. I mean, there's the statutory... I don't think it's about why competent defense counsel should be allowing innocent people to plead guilty when they know there's a viable defense. I mean, a standard question in a guilty plea is, are you aware of any viable defense? And that would prevail and defense counsel have to answer that question. It would seem to me that based on the record here, a defense counsel might've been obliged to say, no, I have questions as to whether he's, was mentally competent to commit this crime, to understand the wrongfulness of the crime. And then defense counsel might go on though and say, I've discussed this with my client. He recognizes that he has a defense, but he is in order to protect himself from the risk of a 32 life sentence, he has decided to accept this plea. And I believe that plea would be accepted by most judges, big understanding that the defendant had made a knowing decision regarding the risk that he faced. He was also prejudiced because he was suicidal while he was, this was such an oppressive detention, not just Dr. Mills, but Dr. Goldsmiths, the psychologist who did a blind interpretation of the testing found that Jakes Johnson suffered from significant suicidal ideation while he was in jail and had taken action toward taking his own life. I'm going to take a little more time just because I'd like you to address, please, the preclusion of the question to Dr. Goldsmith about the effect of PTSD on Mr. Jakes Johnson, that the question, he was not allowed to be asked whether the PTSD can affect an individual's ability to appreciate that his conduct is wrong. And I understood you to be objecting to that preclusion. At the end of the day, he did try to mount an insanity defense. And so could you just address why that was a harmless error, if error was? Yes, Your Honor. The defense had two components. It was PTSD, Jakes Johnson had PTSD, and PTSD can cause one to not appreciate the wrongfulness of one's conduct. By refusing to allow Dr. Goldsmith to address the second question, the court eliminated an essential premise to the jury could not decide the question that it was being asked to decide. Did Jakes Johnson have a severe mental illness? And did that severe mental illness cause him not to appreciate the wrongfulness of his actions? It didn't have the evidentiary base to decide that question, because that's not a question that a lay person would know the answer to. The reason why... The judge seemed to be thinking that this was basically essentially asking Dr. Goldsmith to say, did Mr. Jakes Johnson appreciate the wrongfulness of his conduct or not? The judge did say that, but it definitely was not the same thing. The question was in the abstract. Many, many other courts have held that question is proper. And the reason why it was prejudicial is because the jury, A, the jury was concerned about that very issue. The first question to the court involved, how is wrongfulness different from illegality? It was very focused on the question of whether Jakes Johnson could appreciate the wrongfulness of his actions. There was not... It's not binding. They said it was the exact question. And the court there said, this runs about 704B. Are they wrong about that? They are wrong. Yes, your honor, because Manly involves an extended hypothetical that describes a hypothetical person with the same characteristics as the defendant. This was not a hypothetical question that Dr. Goldsmith was being asked, was a very simple direct question. It said nothing about Jakes Johnson. It didn't implicate Jakes Johnson. It simply said, can a person, can PTSD cause a person, not any specified person, not any described person, can PTSD cause a person not to appreciate the wrongfulness of his actions? The Seventh Circuit, the Eighth Circuit, and many other courts have said that question is not by rule 704B. The circumstances in Manly and the other cases that the prosecution cites are totally in opposite. You're saying that in those other cases in Manly, the description was such there was no mistake that it was the defendant in particular, rather than a hypothetical person. Is that correct? Exactly, your honor. That's correct. Thank you. We've kept you well past your time. Thank you very much. We'll hear from the government and let me invite you, Mr. Guderian, to take your time. We were generous with time with appellant as well. Thank you, your honor. May it please the court, Michael Guderian on behalf of the United States. In addition to trying to answer any questions that the panel might have, I want to address with respect to the defendant's Sixth Amendment speedy trial claim, some of the different periods from arrest until trial to try to clarify what the record shows and does not show about the reasons for delay during those periods, and in doing so, underscore what the government views as a fundamental deficiency in the defendant's ability to succeed on that claim. The pre-indictment period, which was March 2017 to August 2018, approximately 17 months, represents about half of the total time from arrest until trial. It's an important period because the time from indictment to trial, about another year and a half, the government submits, was well within constitutional speedy trial parameters for a case involving an insanity defense and related motion practice, including an expert hearing. The defendant made both general and specific assertions about the pre-indictment period, which are not supported by the Record on Appeal. The general assertion, which was alluded to, I think, by the panel during the claim that the government acted in bad faith during those 17 months from arrest to indictment, and that it never intended to offer a plea, that assertion finds no support on this record. It also makes no sense in the context of a defendant who is actively trying to cooperate in various ways. There was certainly no judicial determination below that the government acted in bad faith. Oh, wait a minute, wait a minute. This is not what you said to the magistrate judge. To the magistrate judge, you, your office, said that this was so you could continue forensic analysis, so that they could review the discovery. I mean, this is an awful lot of information being given about how the needed time was to allow the government to do forensic examinations, right? Is that true? Well, Your Honor, I think that... Sorry, Your Honor. I think it is true, but I would submit partially and complete. So the pretrial speedy trial act exclusion stipulations that you're referring to reference forensic analysis. Over time, they also start to reference plea negotiations. What they don't reference and would not reference in the context of attempted ongoing cooperation is the cooperation itself. The government and the defendant would not put in a stipulation that the defendant is trying to actively cooperate, and it wasn't in the stipulation here. Had the record been developed for a different purpose, that is, for the purpose of assessing the full scope of what was going on during that time period vis-a-vis either a speedy trial act motion or a Sixth Amendment motion, then the government would have addressed it because it would have been raised in such a way. Okay, so what's the earliest date that the government asserted that plea negotiations were going forward? I think the... Bear with me, if you would, Your Honor. I thought I had it up. Before January of 2018? So in June, let's see, January, I think that's probably right. Yeah, that's probably the first time that the government referenced plea negotiations in the public stipulation. So he's arrested in March of 2017, and it's not until January of 2018 that plea negotiations is offered as a reason to extend the time in which to either have a preliminary hearing or indictment, correct? That's the first time it appears in the stipulation, Your Honor, yes. This is a long time. I mean, whether this is a constitutional violation or not, I guess that's what we'll decide, but are you not embarrassed by this? Well, you know, Your Honor, I'm not personally embarrassed by it. I think the record, if it were developed on the extent of the efforts of cooperation and the reasons for the government delaying indictment during that 17-month period, would fully support what the government did here at the request of the defendant. Mr. Gardarian, independent of bad faith or good faith, Ms. Hirsch accurately cites our law, the New Buffalo case, the Roberts case, where you said this time is attributable to the government, right? Well, I think the case law is actually a little bit more nuanced than that in terms of determining reason for the delay in the context of plea negotiations. I think this court's Swinton decision doesn't necessarily charge those to the government, but cooperation or efforts at substantial assistance matter, too, because if the right that's being protected here is principally the government's obligation to bring someone to trial, and that person is asking the government not to bring them to trial while they explore the to, you know, give themselves an opportunity to unlock a mandatory minimum. Let me ask you about the waiter period that they, I asked Ms. Hirsch about this, too, but why when the government, obviously, they file their notice of insanity defense, they give the report a few months later for Dr. Goldsmith, the government is going to make a motion to preclude. Why shouldn't the government, if they're making a motion to preclude, at the same time start the process of retaining an expert and evaluating the defendant, especially when there was a trial date scheduled, I think at that time it was a trial date of race scheduled for June, so we're in early 2019. There's a trial date in June and the government is moving, you know, piecemeal with respect to the insanity defense. Why isn't that problematic? Certainly, your honor, I think I could sit here and not going to sit here and tell you the government could not have dual-tracked it in that way. I think at the time, as reflected in the stipulation to exclude time and delay trial that both parties signed, the government was following the process that it thought both parties understood would be followed, which was that they would get an expert report, the government would make a decision about whether to seek to preclude it. Ultimately, the government does dual-track it. Relatedly, if I could, the defense counsel suggests in their briefing that your colleague was not accurate with regard to the timing of the government's retention of an expert here, and I didn't see any response to that in the government's briefing. They say that the AUSA did not, was not straightforward with the district court when he said at the May 22, 2019 conference that the government had not yet retained an expert witness and would reach out to experts nationwide immediately after the conference, but Dr. Mills testified that he was retained in the spring of 2019 earlier, you know, in May 7th. I was confused about this, and I didn't see any clarification or rebuttal in the district court's briefing because that was a serious charge in my view. Okay, so your honor, I think what, and I believe that the record would bear this out. It may be that it would need to be supplemented, and we could certainly do that if the court wants. The government writes a letter after the conference and explains exactly what happened here, which was truthful, which is that Dr. Mills had been contacted but not retained until the government could appropriate funds to do that. When at trial, he's asked when he was retained, he makes a common-sense answer and says, oh, I was contacted. He uses the time that he was first contacted by the government, but he wasn't authorized to do. But in the, I'm sorry to interrupt you, but in the colloquy with the court, he said, well, I'm going to have to now reach out and do a nationwide search. It's going to be hard for me to do this. I have to, you know, New York is in a hotbed of psychiatric care, upstate isn't. This is going to take a significant period of time, so the government's looking for more time. It's not that we've contacted someone but haven't retained the person yet, or we don't have the funds. It's like we're starting fresh here. It seemed really, you know, inconsistent with what government was otherwise portraying. Well, so I, of course, can't speak for my co-counsel. I don't think that that's what the, I don't think that's what the import of what was being said or trying to be conveyed to the court was. We're going to do a fulsome search, and maybe to the point that Judge Bianco made earlier, there had been some effort to reach out preliminarily without retaining someone, which, you know, for the government requires appropriating funds and getting everything lined up to do that. It's then done, you know, by June, which is a few weeks later. I mean, I think when Dr. Mills testifies that he's retained in May, I think he's referring to the fact that that's when he was contacted. I don't know that the record suggests otherwise, but I understand that, you know, counsel's relying on Mills' testimony. I'm trying to explain as best I can to the court that I think Mills is referring to when he was first contacted by the government, but he's actually put on retain, that is retention, I suppose, when he can do work, because he can be paid for it, because before that happens, he can't be paid for it, if that answers your question. It still strikes me as inconsistent with the announcement that more time is going to be needed because I now have to start a nationwide search, but I don't want to linger on this. I just understand. I mean, the government does retain and obtain a report from an expert in approximately the same amount of time that it took the defendant to do that at the beginning of trial. Sorry, Your Honor. Yeah, no, maybe you could go on actually to address, unless my colleagues have any further questions on timeliness, you could address the district court's preclusion of the hypothetical question about whether a person suffering from PTSD could, it might be that such a person could not appreciate the difference of right and wrong and the importance of his conduct in this circumstance, because it seemed to me that this was potentially on the correct side of the hypothetical that one is allowed to ask an expert under 704. And unlike in Manley, which gave such an extensive discussion of the seemed clearly to be asking the expert to opine on the ability of that defendant to appreciate the right or whether his conduct was right or wrong. What in particular was incorrect about this framing of the question in your view? So let me start by saying, Your Honor, I don't think that the judge erred at all. I certainly don't think it was an abuse of discretion. And I don't think it's makes sense in this context to look at those two questions that the defense attorney tried to ask at the very end of his examination and say, well, in isolation, they could have been appropriate questions that defense had elicited substantial expert testimony about PTSD, its effects, its implications had done multiple hypotheticals tied directly to the facts of this case clearly about Jake Johnson, and then ask those two questions on the heels of the prior ones setting up Jake Johnson. Don't you agree, though, pardon me for interrupting, but don't you agree, though, that that formulation, even in context where there's been a lead up and discussion of PTSD in this defendant's circumstances, this formulation of the question has been accepted in the seven circuits, other circuits? Well, I mean, I can't speak to the full set of circumstances in which those questions were asked. That is what hypotheticals may have been set out before to tie the question then to that defendant, which is the thing that you're not allowed to do. It's an awfully fine distinction where I think context can really matter, Your Honor, which is why here I just fundamentally don't view it as an abuse of discretion, even if the court were to conclude that a judge might have gone the other way under these circumstances. Thank you. I see I'm over my allotted time. We were generous also with the appellant's counsel. So if there's more you'd like to say, we've occupied a fair amount of your time. Well, Your Honor, you know, with respect to the delay period, I guess I come back to the point that I made at the beginning, which is that, and to perhaps connect to I think it was maybe Judge Sullivan's comment. If the argument here is, you know, defense counsel should have behaved differently, should have not pursued the cooperation because he had a viable trial defense or shouldn't have agreed to certain delays in the trial, conceivably that could be explored on collateral review and an effective assistance to counsel. But I think on this record, under plain error review, which the government argues applies, he hasn't established plain error review. And for those reasons, I respectfully request that the judgment be affirmed in all respects. Thank you, Your Honors. Thank you very much. I will hear rebuttal. Ms. Hirsh? Thank you, Your Honor. First, turning to the evidentiary question, none of the questions that were asked of Dr. Goldsmith addressed the issue of wrongfulness. This was the only issue. He was addressed. He did answer questions regarding the fact that PTSD, that Jake Johnson used child pornography to relieve his distress and that his overwhelming symptoms from PTSD, but nothing addressed the question of wrongfulness. This was an essential question that he was not allowed to ask. Can I interrupt you on that? Because there was a question on, this is the transcript at page 632, I think, where the question is, please tell us to a reasonable degree of psychiatric certainty what the effect was on Ben of viewing child pornography on the dates relevant to this jury. There was no objection to that question, but the answer included a statement about your client, quote, doesn't see that what he's doing is immoral. It's a choice that if he does it to bring down, and then there's an objection, and then it's esteemed. I mean, that seemed to be an improper question about asking the doctor to say what the effect was and what the mental state of the defendant was. Do you agree that that was improper? I believe that the doctor, I don't know that the question was improper, but I understand that when Dr. Goldsmith ventured into saying that it was, he didn't perceive it to be immoral. He was getting into an area that was prohibited, and the objection was therefore rightfully sustained, but that doesn't have bear on whether or not he should not have been allowed to answer the question in the abstract of whether. So the jury did have no evidence on that issue, and he had to answer the question in the abstract because without it, they couldn't decide that question. So can I just follow up? I mean, the question that was the objection was, I don't know if an objection was made. It was sustained without an objection, but the question was a person suffering from post-traumatic stress disorder, can that affect an individual's ability to appreciate that his conduct is wrong? And you're saying that should have been permitted, right? Yes, your honor. But then there's a sidebar, and Mr. Gottlieb then sort of clarifies what he wants to ask, and what he wants to ask is, can you tell the jury to a reasonable degree of psychiatric certainty if a person suffering from post-traumatic stress disorder can know that specific conduct is illegal? I mean, isn't that an improper question? Your honor, I don't have... PTSD precludes guilty knowledge, right? Or the ability to appreciate the wrongfulness of conduct. I'm sorry, your honor. I don't have that part of the transcript in front of me. I believe, and I don't think that really, so I don't know what follows after that, but obviously that question wasn't significant because, first of all, it was established that Jakes Johnson did understand that his conduct was illegal, and second, that is not the test that's the test under rule 17 of the insanity defense. So it wasn't the question that the jury needed to resolve. The jury needed to resolve whether he could appreciate wrongfulness. And I don't know if there's other information there that would... What happened after that? Well, after that, the judge basically says, well, that's no different than asking him the prohibited language question that I already sustained an objection on. So then Mr. Gottlieb then just moves on. But that question really didn't help the matter because the evidence showed that Jakes Johnson did know it was illegal, and the jury was concerned with, is illegality the same thing as wrongfulness? And so it really needed expert help, expert help on that issue. And illegality was not the issue here. It was wrongfulness. Just turning back to your question, Judge Carney, I do want to say that the prosecution put in a motion to supplement the record to create several areas of the record where it believed that there were misimpressions created by our main brief. And it obviously could have put in some evidence showing that Dr. Mills was not retained between when he said he was, which was between Dr. Goldsmith's first report and his second, between January 28th and May 7th. He was very clear when he testified. He said I was retained between those two events. And as Your Honor pointed out, in the May conference, the prosecutor goes on and on about how he's going to need to look all over to find an expert. This is going to be a very difficult endeavor. He's going to need a someone. He gave no indication that he had contacted anybody, that they had somebody, that they just needed funding. And then he again, he goes on with that same misrepresentation at the following conference saying we just found somebody, but he's going to need two and a half months. This was an entire, the court certainly could not understand from what the prosecutor said that he already had some somebody, in which case the court might've said, we'll get him to examine Jake Johnson immediately because this trial is scheduled for June 17th. This man has already been in jail for so many months. And if you have somebody, you need to get that funding in place immediately. And this trial needs to go forward. That's not what happened. All right. Thank you very much. I think we have the arguments. Thank you both. Thank you, your honors. We'll take the matter under advisement. Thank you.